IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


THOMAS CUMBEST, ANN CUMBEST,
and Juvenile Female ZC, a minor                                    PLAINTIFFS

VERSUS                          CIVIL ACTION NO. 1:07cv968WJG-JMR

GERBER LIFE INSURANCE COMPANY, a
non-resident corporation of the State of
Mississippi; NORTHROP GRUMMAN
CORPORATION, a non-resident
corporation of the State of Mississippi;
and THE VOLUNTARY ACCIDENTAL
DEATH AND DISMEMBERMENT POLICY
FOR EMPLOYEES OF NORTHROP
GRUMMAN CORPORATION                                            DEFENDANTS


<u>MEMORANDUM OPINION</u>


THIS CAUSE is before the Court on the motion [21] for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure filed by the Defendants, Gerber Life Insurance

Company [Gerber] and The Voluntary Accidental Death and Dismemberment Policy for

employees of Northrop Grumman Corporation [Policy].  Also pending before the Court is the

motion [18] for summary judgment filed by Plaintiffs, Thomas Cumbest, Ann Cumbest and

Juvenile Female ZC Cumbest [collectively, the Cumbests].  The parties have agreed to submit

the matter to the Court on cross-motions for summary judgment.  (Ct. R., Minute Entry, July 28,

2009; Doc 16.)  The Court has duly considered the record in this action, in addition to the briefs

of counsel, and being otherwise fully advised in the premises, concludes as follows.

<u>Standard of Review</u>

A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party, ". . . the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there are no genuine issues of  as to any material fact . . ." Fed. R. Civ. P. 56(c).  In determining whether there are any genuine issues of material fact, this Court must first turn to the applicable law to discern what factual issues are, indeed, material.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The Court must examine the evidence in a case involving the Employee Retirement Income Security Act [ERISA] in which a denial of benefits is challenged "using a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989).  Generally, a plan administrator's factual findings concerning the claim for benefits should be reviewed using an abuse of discretion standard.  *Pierre v. Connecticut General Life Ins. Co.*, 932 F.2d 1552, 1553 (5th Cir. 1991), *cert. denied* 502 U.S. 973.

<u>Statement of Facts</u>

The Cumbests filed suit to recover benefits under the Policy insured by Gerber's Group Policy Number PAI-2020.  (Ct. R., Doc. 1.)  Gerber received a proof of death claim form and the certified death certificate for Pamela Cumbest [Pamela] on April 5, 2004.  (Ct. R., Doc. 22; GL-0944[1])  According to the Cumbests, Pamela's death resulted from her motor vehicle accident on February 10, 2004.  (Ct. R., Doc. 18, p. 2.)  Pamela's death is the focus of the dispute between

---

[1]All citations to "GL" documents can be found in the Administrative Record of Gerber.  (Ct. R., Doc. 24 and its subparts 1 through 9.)

the parties.  According to A.C. Newman & Company [Newman], a third-party claims administrator for Gerber, after review of the available evidence, Pamela died as a result of acute cardiac arrest complicated by an anoxic brain, which resulted in cerebral edema.  (*Id.;* GL-0435-0442.)

The death certificate states that Pamela succumbed on February 12, 2004, to, among other injuries, a massive brain edema due to or as a consequence of cardiac respiratory arrest and recent drug intake.  (Ct. R., Doc. 22; GL-0943.)  Initially, the Cumbests believed that Pamela's death was the result of accidental overdose as indicated on the death certificate, and submitted a claim for Accidental Death and Dismemberment [AD&D] benefits to Gerber.  (Ct. R., Doc. 19, p. 7.)  The Cumbests' claim for AD&D benefits was denied by Newman, in a letter dated July 2, 2004.  (Ct. R., Doc. 22; GL-0838-0844.)  The denial indicated that Pamela's death was not a loss due to accidental bodily injury, but was a result of an acute myocardial infarction which resulted in cardiac arrest.  (*Id.*)

The Cumbests hired an attorney to assist them in their claim for AD&D benefits from Gerber.  (Ct. R., Doc. 19, p. 7.)  The attorney had an independent review of the medical records performed by Gulf Coast Medical Legal Consultants, Inc., [Gulf Coast].  (Ct. R., Doc. 18-4; GL-0225-0228.)  Gulf Coast found that Pamela's death was preceded by a small liver laceration which occurred in the automobile accident on February 10th.  (*Id.*)  The findings in the report are that Pamela suffered a slow bleed from this liver laceration which resulted in a drop in blood pressure, causing a decrease in her respiration.  (*Id.*)  The report goes on to explain that she may have swallowed some stomach contents causing her to stop breathing.  (*Id.*)  Once she stopped breathing her heart stopped beating and the brain stopped receiving oxygen.  (*Id.*; GL-0228.)  Her

brain suffered irreversible damage as a result, causing the swelling found in the brain during the autopsy. (*Id*.)

Plaintiffs submitted Pamela's medical records to Dr. William Striegel for review to allow him to determine the cause of death. (Ct. R., Doc. 19, p. 9.) Dr. Striegel found that Pamela's death was caused by a laceration of her liver capsule and subsequent peritoneal bleeding. (Ct. R., Doc. 18-4; GL-0231.) Dr. Striegel found that Pamela died as a result of the injuries she received in the motor vehicle accident on February 10, 2004, and asserts that the liver was lacerated as a result of the accident which can occur when the body is compressed against a non-movable object, such as the arm rest or console of the vehicle. (*Id*.; GL-0234.) He explains that when this situation occurs, the sheering force produced as a result causes a laceration as the liver tears from the site where its ligaments attach to the diaphragm and abdominal wall. (*Id*., Exh. 18; GL-0234.)

Dr. Striegel responded to an inquiry from Newman in which he stated that his opinion, based on a reasonable degree of medical certainty, was that Pamela's death was directly related to and caused by the February accident. (*Id*., Exh. 18; GL-0233-0236.) Dr. Striegel opined as follows:

> I have reviewed the medical records of Pamela Cumbest. It is my professional opinion that the cause of her death was the laceration of her liver capsule and subsequent peritoneal bleeding. It is also my opinion that it occurred during a motor vehicle accident on February 10, 2004.

(*Id*.; GL-0818.)

Pamela went to the hospital on the day following her automobile accident and these emergency room notes were taken:

The patient had a headache that began about 3:00 yesterday. The headache is located behind her left eye. It is a sharp constant pain. It has been constant. It is similar to her issue of migraine headaches in the past. She was in an auto accident yesterday just before the headache began. She does not recall hitting her head but she did have her neck jerked and her neck has been hurting since that time. Also some pain in her right chest wall. She denies any abdominal pain. She had nausea but no vomiting. She was hit from behind by another auto and she had her seatbelt on.

(*Id.*; GL-0629.) Pamela was discharged around 1:09 P.M., and sent home with medications for nausea and pain. (*Id.*; GL-0088-0089, 0104-0105.)

Later that night, the Cumbests called an ambulance when Pamela went into cardiac arrest at home. (*Id.*; GL-0627.) CPR was administered on Pamela from the time she was found not breathing until the ambulance arrived, a period of about 20 minutes. (*Id.*; GL-0644, 0648.) Shortly after she was admitted to the hospital, a CT scan of Pamela's abdomen was done. (*Id.*; GL-0678.) The CT scan revealed a tiny liver laceration and no presence of blood was noted in the peritoneal cavity. (*Id.*) The doctor opined that Pamela appeared to have sustained an anoxic brain injury. (*Id.*; GL-0647.) The death certificate dated February 19, 2004, specifically cited as the causes of death massive brain edema, cardiac/respiratory arrest, recent drug intake, pulmonary atelectosis[2], fractured (fx) ribs, and subcapsular[3] hematoma of the liver. (*Id.*; GL-0203.) The death certificate indicates that Pamela's death was determined to be an accident due to prescription medication intake. (*Id.*)

An autopsy performed by Dr. Paul McGarry at Singing River Hospital on February 15, 2004, indicated recent drug intake, pulmonary stelectasis, congestion and edema; dilated heart

---

[2] Atelectasis is the collapse of part or all of a lung.

[3] Subcapsular hematoma is a localized collection of blood in an organ situated below a capsule.

and hypoxic[4] myocardium[5]; and a massively swollen softened brain. (*Id*.; GL-0842.) Dr. McGarry found that the conditions were a result of recent prescription drug intake, while the rib and sternum fracture and hematoma of the liver were a result of resuscitation efforts. (*Id*.) A laceration of liver tissue 1 centimeter long and 2 millimeters deep along the medial edge of the left lobe was found during the autopsy. (*Id*., Exh. 14; GL-0209.)

According to Cumbests, other insurance reports showed that Pamela suffered from internal bleeding prior to her death. (Ct. R., Doc. 19, p. 12.) Nevertheless, Newman determined that Pamela's death was not a result of the February 10, 2004, accident. (Ct. R., Doc. 18; GL-0300-0310.) An independent medical review of the evidence by Dr. Timothy Reynolds, M.D., was performed at Newman's request which determined that Pamela died from a heart attack. (*Id*.; GL-0311-0318; 0443-0596.) Dr. Reynolds reviewed the medical records for the five- year period preceding Pamela's death, along with Dr. Striegel's reports and materials submitted by the Cumbests in preparation of his report. (Ct. R., Doc. 24-3, GL-0307.)

Newman issued its determination regarding coverage in this case on July 2, 2004. (Ct. R., Doc. 18; GL-0838-0843.) The claim was denied in part based on Newman's finding that the monetary contributions made by the Plaintiffs were insufficient for the amount. (*Id*.; GL-0842.) Additionally, Newman cited the autopsy report which indicated that, according to the autopsy report, several of her conditions were the result of recent prescription drug intake; and fractures of the sternum and rib, and the liver hematoma were attributable to resuscitation efforts. (*Id.*)

---

[4]Hypoxia is a reduction of oxygen supply to tissue.

[5]The mycardium is the middle and thickest layer of the heart wall.

And, as previously stated, the death certificate attributes the massive brain edema due to cardiac/respiratory to the accidental intake of prescribed medications. (*Id*.)

Accordingly, Newman provides that Pamela's death was caused by her use of prescription drugs, which is a loss specifically excluded under policy Exclusion (d), a loss caused by or resulting from medical or surgical treatment. (*Id*.) Newman indicated that to perfect the claim under Policy Number PAI-2020, the claimants would have to demonstrate that Pamela's death was a result of accidental bodily injury which is direct and independent of any other cause and that her death was not caused by or resulting from medical or surgical treatment (such as prescription medication). (*Id*.; GL-0843.)

In a letter dated August 31, 2004, the Plaintiffs responded to Newman indicating that adequate payments were made on the policy to qualify for payment under the policy. (*Id*.; GL-0813.) Plaintiffs sent copies of payments made by other insurers as proof that Pamela's death was determined to be a result of the automobile accident. (*Id*.; GL-0801–0802.) Following this submission, Newman determined that further investigation was necessary before a decision on the appeal of the claim could be issued. (*Id*.; GL-0750.) On November 24, 2004, Newman indicated as follows regarding contributions to the policy:

> After further review of the applicable rates and information regarding Mr. Cumbest's weekly contributions, Gerber Life now agrees with you the contributions were made for a Principal Sum of $379,000 under Policy Number PAI-2020.

(Ct. R., Doc. 18-6; GL-0744.)

In addition, Gerber Life sought a list of all physicians and medical care providers who treated Pamela within the five years prior to November 2004. (*Id*.) This information, along with

other updates which may have been relevant to the inquiry, were sent by the Cumbests' attorney to Newman.  (*Id*.; GL-0319-20; 0730-42.)

Newman also requested Pamela's complete records from Singing River Hospital.  (*Id*.; GL-0608-0711.)  According to those records, a family member called an ambulance service at 11:04 P.M., on February 11, 2004, to report Pamela's cardiac arrest.  (*Id*.; GL-0110-0111.)  The ambulance report indicates that Pamela was found on the floor, that she had been in a car wreck Tuesday, and starting hurting Wednesday, prompting her visit to emergency room.  (*Id*.)  She was asleep in a chair at her home, and when her husband checked on her she was not breathing.  (*Id*.)  Her blood pressure was noted as 0/0 and pulse was noted as zero at the first check by the paramedics.  (*Id*.)  Her electrocardiogram [EKG] details at this time was noted as "asystole[6]." (*Id*.; GL-0110.)  The observations and examination indicates that Pamela was found apnec[7] and pulseless.  (*Id*.)

The death summary prepared by the hospital indicates that she was treated when she was at the emergency room the morning of February 11, 2004; a CT of her brain was normal.  (*Id*.; GL-0118, 0631.)  She was discharged to home at about 1:00 P.M.  (*Id*.; GL-0644.)  A family member noted Pamela was asleep and snoring in her chair at home around 10:00 P.M.  (*Id*.)  The hospital report notes that the family started CPR after finding her without a pulse just before 11:00 P.M., at home.  (*Id*.)  Pamela arrived at the emergency room with a pulse and blood

---

[6] **Asystole:**  A dire form of cardiac arrest in which the heart stops beating -- there is no systole -- and there is no electrical activity in the heart.

[7] Without respiration.

pressure, however she was not responsive to pain or verbal stimulation upon examination at the hospital following transport to the hospital by the ambulance. (*Id.*; GL-0645-46.)

A CT of the brain revealed "diffuse cerebral edema, likely as a result of the anoxic injury." (*Id.*) She was "admitted to the MICU on pressor support for her hypotension, and at that time her pupils were already fixed and dilated." (*Id.*; GL-0638.) The notes also indicate that "it was obvious she had suffered a tremendous anoxic brain injury." (*Id.*) A CT scan of the abdomen and pelvis did not reveal "any significant intra-abdominal bleed or other explanation for her present status." (*Id.*; GL-0649.) An assessment by William Avara, M.D., at 2:50 A.M., finds "no significant thoracoabdominal injury from the physical examination." (*Id.*; GL-0653.) According to an assessment made at 2:44 A.M., she had low blood sugars, attributed to the fact that she sustained cardiac arrest. (*Id.*; GL-0647.) A decision was ultimately made by the family to remove Pamela from life support, and shortly thereafter she died. (*Id.*) An autopsy was requested "given the unclear etiology of her cardiorespiratory arrest." (*Id.*)

The denial letter for Cumbests' appeal, dated May 31, 2005, provides that no information was provided to substantiate the Cumbests' position that payment on the USA Insurance Company policy proves that the motor vehicle accident in which Pamela was involved was the direct and independent cause of her death. (*Id.*; GL-0301.) Gerber Life extended the appeal period on the claim to allow a thorough investigation of the claim that an automobile accident was the direct and independent cause of Pamela's death. (*Id.*; GL-0302.)

In addition, after receiving information concerning payment by Hartford Life Insurance Company and Dr. Striegel's supplemental report, further time was allowed for the appeal. (*Id.*; GL-0303.) Additional information was received following the determination by State Farm

Insurance [State Farm] to honor the claim submitted by the Cumbests. (*Id.*; GL-0304.) Gerber indicates that no information was supplied to substantiate the Cumbests' position that State Farm's decision to pay the claim proves that the motor vehicle accident was the direct and independent cause of Pamela's death. (*Id.*; GL-0305.)

Dr. Reynolds found that lab tests performed on February 12, 2004, revealed no signs of anemia, which indicated to Dr. Reynolds that Pamela had not suffered hemoperitoneum (blood in abdominal cavity) prior to February 12, 2004, and the small laceration in the liver capsul occurred as the result of resuscitation efforts . (*Id.*; GL-0435-0442.) According to Dr. Reynolds' report, laboratory tests performed on Pamela at Singing River on February 12, 2004, showed an elevated troponin I at 2.1, which was elevated at 6.4 at 9:20 A.M. (*Id.*; GL-0312.) An EKG performed the same day revealed ST segment depression in the anterolateral and inferior leads suggestive of subendocardial injury. (*Id.*) Dr. Reynolds opines that these laboratory results suggest that Pamela experienced an acute myocarial infarction on the evening of February 11, 2004, and this incident resulted in three conditions which led to her death. (*Id.*) The cardiac arrest was complicated by an anoxic brain syndrome which rendered Pamela unconscious, and resulted in cerebral edema. (*Id.*) Also, the cardiac arrest resulted in disseminated intravascular coagulation which made her prone to blood loss and liver parachymal damage. (*Id.*) The CPR induced liver injury which resulted in the hemoperitoeneum which occurred several hours after her hospitalization, and was evidenced by a low hemoglobin (evidence of anemia) on the lab tests performed on the morning of February 12, 2004. (*Id.*) Dr. Reynolds could not connect the acute myocardial infarction with the traffic accident the day prior or with any specific medication Pamela had been taking. (*Id.*)

Dr. Reynolds stated that Pamela's automobile accident was a minor one, and noted that the emergency room records do not show any sign of significant abdominal trauma. (Ct. R., Doc. 24-3, GL-0308.) Pamela did not state she had abdominal injuries and her abdominal examination was benign. (*Id.*) Dr. Reynolds opined that physical trauma (in association with the automobile accident) to the liver capsule, such as a laceration or hematoma, would have been more uncomfortable to Pamela. (*Id.*)

Dr. M. Mauldin of Singing River emergency room evaluated Pamela indicating that the changes in the EKG were nonspecific and noted the elevated troponin. (*Id.*; GL-0314.) He referred to the abdominal CT scan by stating that there did not appear to be any significant intra-abdominal bleed or explanation for her present status. (*Id.*)

Dr. J. Fontan concluded that Pamela "likely has sustained a severe liver insult secondary to her cardiac arrest in the field" as indicated in the admission and physical to Singing River on February 12, 2004. (*Id.*) He stated that Pamela probably sustained "anoxic brain injury" due to her cardiac arrest and indicated that he did not feel she would survive the incident, which occurred at her house. (*Id.*)

Accordingly, Newman determined that Pamela's death was not the result of accidental bodily injury direct and independent of any other cause, but was the result of an acute myocardial infarction which resulted in cardiac arrest. (*Id.*) Newman emphasized Dr. Reynolds' finding that the small liver laceration "occurred . . .when it did because of cardiopulmonary resuscitation efforts just over one hour earlier." (*Id.*) "Because Mrs. Cumbest's death is not due to accidental bodily injury direct and independent of any other cause, but is in fact due to an acute myocardial infarction which resulted in cardiac/respiratory arrest, this loss is not covered under the terms of

the policy." (*Id.*; GL-0310, emphasis original.) In addition, Gerber indicated that Pamela's death was "caused by and resulted from ' . . . disease'" (i.e. her myocardial infarction), a loss specifically excluded from coverage under General Exclusion (c). (*Id.*) The Cumbests were notified that because the denial was based on Dr. Reynolds' report, which was produced to the Cumbests for the first time in the denial, Gerber offered an additional opportunity to have a review and reconsideration of the claim performed. (*Id.*)

Upon receipt of additional information from the Cumbests, including an order from the Chancery Court of Jackson County, Mississippi[8], and further information from Dr. Striegel dated December 20, 2005, the information was sent to Dr. Reynolds for further review. (Ct. R., Doc. 22, pp. 17-18.) Dr. Striegel found as follows:

> It is still my opinion that the myocardial infarction was due to the internal bleeding
> caused by the lacerated liver. It is also to be noted that I do not feel that the ribs
> that were alleged to be fractured at the time CPR was administered caused her
> liver to become lacerated. The location of the 2nd-5th ribs that were fractured on
> the left side are not at or near the left lobe of the liver.
>
> It still remains my opinion that the motor vehicle accident of February 10, 2004,
> caused the liver laceration which ultimately resulted in the death of Mrs. Cumbest.
> There is no doubt that there was bleeding from the liver injury which preceded
> any of the CPR and the Emergency Room visit on the night of her death.
>
> * * *
>
> In conclusion, it is my opinion based upon a reasonable degree of medical
> certainty that the death of Pamela Cumbest was directly related and caused by the
> motor vehicle accident of February 10, 2004.

(Ct. R., Doc. 18-5; GL-0278.)

---

[8]The referenced order is an order approving settlement, authority to pay fees and expenses, and to deposit funds into a guardianship account for the minor child. The order references the report by Dr. Striegel finding that Pamela's death was the result of the February 10, 2004, automobile accident.

Dr. Reynolds' August 7, 2006, report following review of this information concluded that Dr. Striegel's assessment of Pamela's injury was incorrect. (*Id.*, p. 19.) In particular, Dr. Reynolds took issue with Dr. Striegel's finding that Pamela's myocardial infarction was due to internal bleeding caused by the lacerated liver. (*Id.*)

The autopsy report indicated "[t]he peritoneal cavity contains 1700 ml. of unclotted blood issuing from a subcapsular hematoma of the undersurface of the left lobe of the liver overlying a superficial laceration of the liver 1 cm. long, 2 mm. deep, diagonal, along the medial edge of the left lobe inferiorly." (Ct. R., Doc. 18-4; GL-0209.) Dr. Reynolds indicates that an abdominal CT scan taken on February 11, 2004, revealed the following:

> Heterogeneous liver and spleen enhancement is noted of uncertain significance. It is possible this is related to hypotension. A small focal hypodensity in the liver likely is related to this underlying process but it is conceivable that this represents a tiny liver laceration given a history of trauma. No hemoperitoneum[9] is seen in association, however.

Ct. R., Doc 18-4; GL-0200.)

The emergency department admission history and physical which shows that Pamela was admitted on February 12, 2004, following her transport by ambulance from her home to Singing River. (Ct. R., Doc. 24-2; GL-0128.) The records note that a CT scan of her brain taken on the morning of February 11, 2004, was normal, although there is no indication that a CT scan of the abdomen was taken at that time. (*Id.*; GL-0118.) A CT scan of her abdomen taken after her presentation at the ER resulted in the findings summarized by Dr. Reynolds in his report. (*Id.*; GL-0218, 0126, 0129, 0131, 0133.) The chart from the Singing River Hospital Department of

---

[9]Hemoperitinoeum is defined as the presence of blood in the peritoneal cavity. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1055 (1981).

Radiology contains the following notes concerning Pamela's emergency CT scan of abdomen on

February 11, 2004:

> Heterogeneous enhancement of the liver and spleen is noted. This may in part reflect streak artifact from objects outside the patient. An approximately 1.5 cm focal hypodensity is seen in the medial segment of the left lobe of the liver (image 18), adjacent to the fissure for the ligamentum teres.

* * *

> No hemoperitoneum or pneumoperitoneum is identified.

(*Id*.; GL-0157-0158.)

Dr. Reynolds opined that the resuscitation efforts were "probably more traumatic to this

woman's chest wall and internal organs than the minor automobile accident that she suffered on

February 10, 2004." (*Id*.; GL-0020.) In addition he states:

> Moreover, if there was no blood in the peritoneal cavity on careful examination of this woman on February 11, 2004, including an emergency CT scan of the abdominal cavity, but blood was found in the peritoneal cavity after her death the following day, then it stands to reason that bleeding must have occurred *after* Ms. Cumbest went to the hospital late on the evening of February 11, 2004, *after* she was subjected to life-saving (at the time) CPR, and *after* she had suffered an acute myocardial infarction at home complicated by cardiac arrest.

(*Id*.; GL-0020, emphasis in original.)

The final supplemental internal medicine report issued by Dr. Reynolds was dated August

7, 2006. (Ct. R., Doc. 24; GL-0016.) In that report, Dr. Reynolds reviewed all the updated

reports submitted by the Cumbests regarding Pamela's death. (*Id*.) Dr. Reynolds indicated that

after reviewing all the available records, he found nothing in the records which would change his

prior opinions concerning Pamela's death. (*Id*.; GL-0019.) Dr. Reynolds summarizes that "this

is simply not the history of a liver-injury induced cardiac arrest, based on reasonable medical

probabilities." (*Id*.)

Pursuant to these finding, the decision on the Cumbests' claim was upheld on appeal. (Ct. R., Doc. 22, p. 19.) Each of the documents sent to substantiate the claim were examined and rejected by Newman. (Doc. 24, GL-0001-0010.) An injury is defined under the policy as "accidental bodily injury which: (I) is direct and independent of any other cause; and (ii) requires treatment by a licensed physician or surgeon acting within the scope of his or her license." (*Id.*; GL-0003.) The general exclusions include: "Benefits are not paid for any loss caused by or resulting from: (c) any kind of disease; and (d) medical or surgical treatment (except surgical treatment required by the accident." (*Id.*; GL-0004.)

Gerber concluded that Dr. Reynolds found Pamela's death was the result of an acute myocardial infarction after reviewing all the available records and reports. (*Id.*; GL-0004.) Newman contends that the Cumbests were informed that Pamela's death was not due to accidental bodily injury direct and independent of any other cause, and consequently the loss is not covered under the terms of the policy. (*Id.*) In addition, Newman indicated that Pamela's death was caused by and resulted from "any kind of disease" (i.e., her myocardial infarction), which is specifically excluded from coverage under general exclusion (c) of the policy. (*Id.*)

Newman contends that Dr. Striegel did not provide evidence to substantiate his assertion that Pamela's liver injury preceded the time that CPR was administered to her or the emergency room visit. (*Id.*; GL-0010.) The autopsy in this case noted that rib fractures on the left and right sides were "resuscitation fractures." (*Id.*; GL-0010.)

Newman concluded that based on all information received on the appeal, Pamela's death was "not the result of accidental bodily injury direct and independent of any other cause, but is the result of an acute myocardial infarction which resulted in cardiac/respiratory arrest, and this

loss is not covered under the terms of the policy." (*Id.*)  Based on this, Gerber upheld its denial

of the claim on appeal.  (*Id.*)

Discussion

The policy in this case specifies that it is governed by the laws of the state of California.

(Ct. R., Doc. 1-2, p. 1.)  In addition, the policy is subject to ERISA.  (*Id.*)  The policy defines the

word injury as "accidental bodily injury which:  (I) is direct and independent of any other cause;

and (ii) requires treatment by a licensed physician or surgeon acting within the scope of his or her

license."  (*Id.*, p. 5.)  Included in the general exclusions to the policy are any loss caused by or

resulting from:  (d) medical or surgical treatment (except surgical treatment required by the

accident).  (*Id.*, p. 25.)

Under the policy, the plan administrator is Northrop Grumman Corporation in Los

Angeles, California.  (*Id.*, p. 30.)  The policy provides as follows regarding the responsibilities of

the plan administrator and other plan fiduciaries:

> In carrying out their respective responsibilities under the Plan, the Plan
> Administrator and other Plan fiduciaries shall have the discretionary authority to
> interpret the terms of the Plan and to determine eligibility for Plan benefits.  Any
> interpretation or determination made pursuant to such discretionary authority shall
> be given full force and effect, unless it can be shown that the interpretation or
> determination was arbitrary and capricious.

(*Id.*)

Plaintiffs claim that there is a potential conflict of interest by virtue of a contract between

Newman, as acting claims administrator, and Gerber.  (Ct. R., Doc. 19, p. 26.)  Because Newman

"receives a degree of economic benefit by virtue of the contractual arrangement" with Gerber,

Plaintiffs argue that a conflict of interest is involved.  (*Id.*)  Gerber contends that Plaintiffs have

produced no evidence in support of their claim, and because the evaluation was performed by

Newman, a separate independent third-party claims administration, no conflict of interest exists. (Ct. R., Doc. 28, p. 3.)  Valerie Araki, operations manager for Newman, averred that Newman is completely independent of Gerber and has no pecuniary interest in the Cumbests' claim for benefits as Newman's compensation is unrelated to the payment or denial of claims  (*Id*.)  The Court finds no evidence of the Plaintiffs' claims of conflict of interest in this case.

The Court must determine if the plan administrator is given discretionary authority to determine benefit eligibility to ascertain the proper standard for review of the determination.  *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 597 (5th Cir. 1994).  A plan administrator's determination is reviewed *de novo* unless the plan gives the administrator discretionary authority to determine eligibility.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the administrator is given discretionary authority, review is done using the abuse of discretion standard.  *Sweatman*, 39 F.3d at 598.  "In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously."  *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992).  Under an arbitrary and capricious standard of review, the function of the court is to determine whether there was "a reasonable basis for the decision."  *Denton v. First Nat'l Bank of Waco, Tex.,* 765 F.2d 1295, 1304 (5th Cir. 1985).  Under the abuse of discretion standard, an administrator's interpretation will stand so long as it is reasonable and shows impartial judgment based upon the facts as known to the administrator at the time the decision was made.  *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993).  In addition, only the evidence that was available to the administrator is considered unless the court is reviewing interpretations of a plan, then

evidence that was unavailable to the administrator can be considered. *Southern Farm Bureau*, 993 F.2d at 102.

In this case the policy clearly gives the administrator discretionary authority to determine benefit eligibility. (Ct. R., Doc. 1-2, p. 30.) As such, the Court will review Newman's decision under the abuse of discretion standard, as indicated above.

Regardless of whether discretionary authority is granted to the administrator, the Court applies an abuse of discretion standard of review to an administrator's factual findings. *See Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 332 (5th Cir. 2001). Under this standard, a decision is overturned if it is found to be "arbitrary or capricious;" and it is affirmed if the decision is supported by substantial evidence. *See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., Med. Benefits Plan*, 168 F.3d 211, 214-5 (5th Cir. 1999). "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.2d 262, 273 (5th Cir. 2004).

As previously set forth herein, according to Dr. Reynolds the immediate cause of Pamela's death was cardiac arrest. (Ct. R., Doc. 18-6; GL-0317.) He reached this conclusion after examining all medical records submitted by Plaintiffs, including the CT scan of the abdominal cavity, the autopsy report , Dr. Striegel's report, the affidavits, the chancery court order, the evaluations of claims submitted to other insurance companies, the nurse consultant report, and the rest of the materials submitted in support of the appeal. (Ct. R., Doc. 24, GL-0002-0010.) Based on Dr. Reynold's considerable experience and expertise, the Court finds that the conclusion that Pamela's death was not the result of accidental bodily injury direct and independent of any other cause was reasonable.

In this case, the policy provides, *inter alia*, the following general exclusions to coverage:

Benefits are not paid for any loss caused by or resulting from:

(c) any kind of disease;
(d) medical or surgical treatment (except surgical treatment required by the accident).

(Ct. R., Doc. 1-2, p. 25; Doc. 24-3, GL-0306.)  This clause contemplates that if disease is a contributing factor or the cause of death, there is no coverage under the policy.  *See Sekel v. Aetna Life Ins. Co.*, 704 F.2d 1335, 1338 (5th Cir. 1983).  This holds true even if a preexisting condition contributes to, but is not the proximate cause of a death.  *Britt v. Travelers Ins. Co.*, 556 F.2d 336 (5th Cir. 1977); *see also Travelers Ins. Co. v. Cowart*, 196 So.2d 887, 888 (Miss. 1967).  Words in an insurance contract should be given their plain meaning.  *Aero Int'l Inc. v. United States Fire Ins. Co.*, 713 F.2d 1106 (5th Cir. 1983).

"[W]here policies provide that an accident must be 'directly and independently' the cause of a loss, the general rule is that if disease is a concurrent proximate cause, the insurance company is not liable."  *Sekel*, 704 F.2d at 1342.  The policy in this case defines the word injury as "accidental bodily injury which:  (I) is direct and independent of any other cause."  (Ct. R., Doc. 1-2, p. 5.)  Clearly, Gerber's intent in this clause was to exclude from coverage losses in which "disease" caused or contributed to the death.  The Court concludes that the loss in this case was caused by or contributed to by Pamela's cardiac arrest, and therefore, is excluded from coverage under the Gerber policy.

Plaintiffs have provided proof that several other insurers paid benefits for this loss, and submitted an order from the Chancery Court which accepted Dr. Striegel's opinion on the cause of Pamela's death in an attempt to establish that coverage under the Gerber policy should be

allowed.  There is no evidence that the terms of the other insurance policies were exactly the same as the Gerber policy terms.  In addition, an administrator's reliance on the opinion of the independent physician, Dr. Reynolds, even though his opinion concerning the cause of death was different than that of Dr. Striegel's, is not an abuse of discretion, especially given the volume of records and reports that Dr. Reynolds reviewed prior to making his final determination.  *Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 335 (5th Cir. 2001.)

The task of weighing conflicting professional medical opinions is given to administrators of ERISA plans.  *See Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246, 249-50 (5th Cir. 2007).  Gerber appropriately considered Dr. Striegel's opinion, however, it was not required to give that opinion determinative weight.  *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 233 (5th Cir. 2004).  Although Dr. Reynolds' findings conflict with Dr. Striegel's opinion, the administrator is allowed to rely on the findings of its medical expert, provided those findings are reasonably supported by the evidence.  The United States Supreme Court, addressing a disability plan decision held that ERISA does not require plan administrators to accord special deference to opinions of treating physicians.  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003).  The Court stated as follows:

> Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id.* at 1966-67.  An administrator does not abuse its discretion by relying on the medical opinion of its consulting physician instead of the medical opinion of a claimant's consulting physician.  *See Sweatman*, 39 F.3d at 597; *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 402 (5th

Cir. 2007). Newman's medical expert, Dr. Reynolds, clearly understood the medical emergency presented the night preceding Pamela's death and markers which led him to his diagnosis. Unfortunately for the family, what precisely triggered the events which culminated in Pamela's death will probably always be an uncertainty.

Although the Chancery Court appears to have given credence to Dr. Striegel's findings the doctrine of collateral estoppel applies to any preclusive effect that court's order may have on a determination concerning the cause of Pamela's death. Collateral estoppel prevents the relitigation of issues which were central to a judgment entered in one case in subsequent litigation between the parties. *Harris v. Washington*, 404 U.S. 55 (1971). Unlike *res judicata*, collateral estoppel only applies to issues actually litigated in a prior suit. *Walker v. Kerr-McGee Chem. Corp.*, 793 F. Supp. 688, 694 (N.D. Miss. 1992). Under Mississippi law, the mutuality of parties in the lawsuits is strictly interpreted for the effect of prior state court litigation on the use of collateral estoppel. *Walker*, 793 F. Supp. at 696. There was no mutuality of parties in the Chancery Court case and this case, therefore, collateral estoppel does not apply in this case.

The Court concludes that Dr. Reynolds' opinion constitutes substantial evidence in support of Gerber's determination that Pamela's death was the not covered under the terms of the policy. Accordingly, the Court finds that Gerber's motion for summary judgment should be granted. Furthermore, the Court finds that the Cumbests' motion for summary judgment should be denied.

<u>Conclusion</u>

Pursuant to the foregoing, the Court finds that the motion [21] for summary judgment filed by Gerber and the policy should be granted. In addition, the Court concludes that the

Cumbests' motion [18] should be denied.  A separate Summary Judgment in conformity with and incorporating by reference the foregoing Memorandum Opinion shall issue this date.  Each party shall bear their respective costs associated with this cause of action.

THIS the 16th day of September, 2009.


_Walter J. Gex III_
UNITED STATES SENIOR DISTRICT JUDGE